JPL:JD
F.#2012R00628

**14M1082**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - X
UNITED STATES OF AMERICA

    - against -

MARGARET AMATULLLI,
FREDERICK ANDERSON,
CHRISTOPHER DAMON,
    also known as "King,"
DARNELL JACKSON and
NICHOLAS SPINELLI,

              Defendants.
- - - - - - - - - - - - - - X

**TO BE FILED UNDER SEAL**

COMPLAINT AND AFFIDAVIT
IN SUPPORT OF APPLICATION
FOR ARREST WARRANTS

(18 U.S.C. §§ 1349 and 3551 et
seq.)

       RYAN ADAMS, being duly sworn, deposes and says that he

is a Special Agent with the Federal Bureau of Investigation

("FBI"), duly appointed according to law and acting as such.

       There is probable cause to believe that in or about

and between December 2005 and May 2014, both dates being

approximate and inclusive, within the Eastern District of New

York and elsewhere, the defendants MARGARET AMATULLI, FREDERICK

ANDERSON, CHRISTOPHER DAMON, also known as "King," DARNELLL

JACKSON, NICHOLAS SPINELLI and others did knowingly and

intentionally conspire to execute a scheme and artifice to

commit mail fraud and wire fraud, contrary to Title 18, United

States Code, Sections 1341 (mail fraud), and 1343 (wire fraud),

respectively.

       (Title 18, United States Code, Section 1349.)

The source of my information and the grounds for my belief are as follows[1]:

1.    I have been employed as a Special Agent with the FBI for 3 years.  I am one of the case agents with primary responsibility for this investigation.  While working for the FBI, I have participated in numerous investigations of criminal activity, and I am assigned to a squad tasked with investigating white collar crime, including but not limited to, securities fraud, wire fraud, mail fraud and money laundering schemes. During the course of these investigations, I have conducted or participated in surveillance, undercover operations, the execution of search warrants, debriefings of informants, and reviews of taped conversations and financial records.

2.    I am familiar with the information contained in this affidavit based on my personal participation in the investigation, my review of documents, my interviews of witnesses and victims, my training and experience, and my discussions with other law enforcement personnel concerning the investigation.  I have also learned of relevant information during discussions with employees of the United States Securities and Exchange Commission ("SEC") which is conducting a

---

[1]    Because the purpose of this affidavit is only to establish probable cause to arrest the defendants, I have not included each and every fact known to me concerning this investigation.

parallel regulatory investigation.  Additionally, statements herein attributable to individuals are set forth in substance and in part.

**INTRODUCTION**

At all times relevant to this Complaint, unless otherwise indicated:

I.   The Defendants and the Relevant Companies

1.   Premier Links, Inc. ("Premier Links") was a New York corporation which operated as an unregistered broker-dealer.  Premier Links maintained a principal place of business in Staten Island, New York from which it employed various "cold callers"[2] to solicit investments in purported securities from victim-investors by telephone.  Premier Links maintained bank accounts at JP Morgan Chase ("the primary bank account") and Bank of America ("the secondary bank account").

2.   Axiologix Education Corp. ("Axiologix") was a Nevada corporation with its principal place of business in East Brunswick, New Jersey.  Its common stock was quoted at various time on the Over-the-Counter ("OTC") marketplace, under the

---

[2]   As used herein, "cold calling" refers to a sales technique whereby a salesperson contacts individuals who have not previously expressed an interest in the products or services that are being offered.

ticker symbol "AXLX."  Axiologix became a reporting company with
the SEC in approximately March 2010.  In approximately July
2010, Axiologix conducted an Initial Public Offering ("IPO").
In approximately October 2011, Axiologix filed a Form 15 with
the SEC to terminate its duty to file reports related to the
company's revenue.  According to its most recent annual report
filed with the SEC in 2011, Axiologix had earned a total of $400
in revenue since its inception in 2009, but had incurred a net
loss of $5.6 million for the year ended May 31, 2011, and had an
accumulated deficit of over $8 million. At various times,
Premier Links purported to sell shares of Axiologix to
investors.

    3.   Island Stock Transfer was the transfer agent for
Axiologix between 2009 and early 2011.  Beginning in February
2011, American Stock Transfer & Trust Company, LLC became the
transfer agent for Axiologix.  In general terms, a transfer
agent is an entity that is assigned by a corporation to maintain
records of its investors, account balances and transactions, to
cancel and issue certificates and to process investor mailings.

    4.   Edumedia Software Solutions Corp. ("Edumedia")
was a New York corporation with its principal place of business
in East Brunswick, New Jersey.  Edumedia's common stock was
quoted on the OTC marketplace, under ticker symbol "EMSW," from

approximately September 2003 until approximately 2006. In approximately 2006, Edumedia's common stock was moved to the grey market, meaning that the stock was no longer traded or quoted on an exchange or interdealer quotation system. In approximately March 2008, Edumedia filed a Form 15 with the SEC to terminate its duty to file reports. At various times, including after Edumedia's common stock was moved to the grey market, Premier Links purported to sell shares of Edumedia to investors.

5.    The defendant MARGARET AMATULLI, a resident of Brooklyn, New York, was the office receptionist and records keeper at Premier Links and solicited investments by telephone on behalf of Premier Links.  AMATULLI was never associated with a registered broker-dealer.

6.    The defendant FREDERICK ANDERSON, a resident of Far Rockaway, New York, was a "cold caller" at Premier Links and solicited investments by telephone on behalf of Premier Links. ANDERSON was never associated with a registered broker-dealer.

7.    The defendant CHRISTOPHER DAMON, also known as "King," a resident of Queens, New York, was a "cold caller" at Premier Links and solicited investments by telephone on behalf of Premier Links.  DAMON was never associated with a registered broker-dealer.

8.   The defendant DARNELL JACKSON, a resident of Hudson, New York, was a "cold caller" at Premier Links and solicited investments by telephone on behalf of Premier Links. JACKSON was never associated with a registered broker-dealer.

9.   The defendant NICHOLAS SPINELLI, a resident of Staten Island, New York was the President of Premier Links from at least December 2005 through September 2007 and solicited investments on behalf of Premier Links.  On or about March 28, 2006, the Pennsylvania Securities Commission issued a summary order against Premier Links and SPINELLI, directing them to cease and desist offering or selling unregistered securities in Pennsylvania.  On or about December 7, 2005, SPINELLI became a signatory on the primary Premier Links account at JP Morgan Chase.  On or about May 30, 2007, SPINELLI became the sole signatory on the secondary Premier Links bank account at Bank of America.  SPINELLI was never associated with a registered broker-dealer.

II.  The Premier Links Fraudulent Schemes

    A. Overview

10.   The defendants MARGARET AMATULLI, FREDERICK ANDERSON, CHRISTOPHER DAMON, also known as "King," DARNELL JACKSON and NICHOLAS SPINELLI together with others, agreed to defraud investors and potential investors in public and non-

public companies, including but not limited to, Axiologix and Edumedia by cold-calling elderly investors and potential investors from a list maintained by Premier Links and making material misrepresentations to induce the victim to invest in companies through Premier Links.

11.   Analysis of Premier Link's bank records, transfer agent records, and interviews of victim-investors indicates that, in or about and between December 2005 and August 2012 Premier Links raised approximately $9 million from at least 300 victim-investors. Some investors were induced to invest in non-public companies with promises that those non-public companies would soon go public at a favorable price.  Those companies were never taken public, nor did they make any efforts to do so. Other investors were induced to purchase shares of stocks which were publicly traded, but were never given stock certificates. Records from the relevant transfer agents indicate that no share certificates were ever issued to those victim-investors.

12.   Analysis of the Premier Links bank accounts indicates that the majority of the investor funds sent to Premier Links were not used to purchase shares or provide working capital to companies, but instead were appropriated by individuals associated with Premier Links.

B.   A Sample of the Victim-Investors

13.   Investor A, an 88 year-old male from Maryland, began purchasing securities from Premier Links in approximately late 2007 after being cold called by an individual who identified himself as "Chris Damon."  Bank records demonstrate that between approximately November 2007 and December 2011, Investor A sent $92,000 to Premier Links.  Investor A understood that the funds were to be used to purchase securities, including shares in Edumedia and Axiologix.  Investor A was repeatedly told by callers from Premier Links that Edumedia and Axiologix would "go public within the next six months" at prices that far exceeded the sales price being offered by Premier Links.  Once Investor A was further told by callers from Premier Links that once Investor A agreed to purchase stock over the telephone, Premier Links would send Investor A documents including a "Stock Purchase Agreement" and a return UPS envelope.  Investor A made stock purchases both by personal check and interstate wire transfer to Premier Links.  Investor A received confirmation letters by mail from Premier Links for these purchases, but in reality the purchases made by Investor A were worthless.

14.   Investor A did not receive stock certificates from Premier Links for his purchase of Axiologix, and records from the relevant transfer agents demonstrate that Investor A

was never issued share certificates for Axiologix, despite the fact that Investor A was told that he purchased over 550,000 shares in Axiologix from Premier Links.

15.   In addition, on or about December 19, 2011, Investor A sent Premier Links a check for $3,043.30 to purchase 30,434 shares in Edumedia. Unbeknownst to Investor A, Edumedia had terminated its duty to file reports with the SEC almost four years earlier.  Investor A purchased shares in Edumedia because he was told by callers from Premier Links that the company would soon "be taken public."  In fact, no IPO for Edumedia ever took place, and the company took no steps to become re-listed on the OTC marketplace.

16.   Investor B, a 79 year-old male from Spokane, Washington, began investing with Premier Links in or around October 2010.  In late 2010, a man who identified himself as "Christopher Damon" solicited investments in Axiologix and Edumedia from Investor B by representing that the companies would soon "go public." Unbeknownst to Investor B, Axiologix was at that time being thinly traded on the OTC bulletin boards, and Edumedia had no business plan to take the company public. Investor B sent Premier Links approximately $139,000 beginning on or about October 29, 2010 and continuing until on or about

February 23, 2012 to purchase stock in Edumedia and Axiologix, among other companies.

17.   To date, Investor B has never received stock certificates in Axiologix, and records from the relevant transfer agents demonstrate that Investor B was never issued stock certificates in Axiologix.  As discussed above, Edumedia was never taken public, nor did it take any affirmative steps in that regard.  As a result, Investor B lost his entire investment in these companies.

C.   Premier Links Steals Investor's Funds

18.   During the relevant period the defendants, together with others, fraudulently obtained approximately $9,000,000 from at least 300 investors from over 40 states. Most of the victim-investor funds were not used to purchase securities but were funneled to the defendants or to entities or persons connected to the defendants.

19.   Specifically, examination of the subpoenaed bank records revealed the defendants induced victim-investors to send approximately $9,000,000, via wire transfer or personal check, to the two bank accounts maintained by Premier Links from at least December 2005 through August 2012.  The records show that shortly after the investors' funds were credited to the Premier

Links accounts, most of the funds were typically diverted to entities or persons connected to the defendants.

20.   Bank records provided by JPMorgan Chase pursuant to subpoena revealed that the primary Premier Links account received approximately $8,787,491 in investor funds from at least December 2005 through August 2012. Beginning in approximately December 2005, the defendant NICHOLAS SPINELLI had signing authority over the primary Premier Links account, and he remained a signatory on the account even as two other co-conspirators from Premier Links were added as signatories.

21.   As investor funds were received in the primary Premier Links account, the funds were diverted to the defendants as follows: (a) $1,411,087 was cashed, including: (1) at least $56,700 in checks written to cash endorsed by the defendant NICHOLAS SPINELLI, and (2) at least $199,975 in teller cash withdrawals by SPINELLI; (b) $458,562 in checks to SPINELLI; (c) $29,150 in checks to the defendant DARNELL JACKSON; (d) $25,116 in checks to the defendant MARGARGET AMATULLI; (e) $18,150 in checks to the defendant CHRISTOPHER DAMON, also known as "King"; (f) $1,050 in checks to the defendant FREDERICK ANDERSON.

22.   Bank records provided by Bank of America pursuant to subpoena revealed the secondary Premier Links account received an additional $518,186 in victim-investor funds from

May 2007 (when the account was opened) through March 2012. The
defendant NICHOLAS SPINELLI had sole signing authority over this
account from May 2007 to the present, but the defendant MARGARET
AMATULLI also exercised control over the account. The statements
for the secondary bank account were sent to AMATULLI's home
address, and AMATULLI deposited investor funds into the account.
Bank surveillance footage demonstrates that AMATULLI withdrew
approximately $2,800 in cash from the secondary bank account
during the month of March 2012 from various bank locations in
the vicinity of New York City.  From in or about and between
January 2010 and March 2012, approximately $186,000 was
withdrawn as cash from the secondary Premier Links account from
ATM machines in the vicinity of New York.  In addition, from
about January 2010 to March 2012, approximately $15,000 was
electronically transferred out of the account (registered to
AMATULLI's home address) and the transfers included the name
"Amatulli Margaret" in the notes section.

          23.  Investor funds received in the secondary Premier
Links account were diverted as follows: (a) $334,018 was
converted to cash (primarily through over 900 separate ATM
withdrawals); (b) $144,578 for purchases of apparent personal
goods and services, primarily by debit card or online bill
payment, including retail shopping at stores including, but not

limited to, Bloomingdales, the Gap, Macy's, Kohls, Old Navy, Century 21, Pathmark, Rite Aid, Party City, Target, Home Depot, Toys R Us, Gamestop, restaurants, gas stations, credit card payments, residential rent payments, car payments, cable and phone bills (at least $20,953 of these were online bill payments that specifically referenced the defendant MARGARET AMATULLI, including car payments to Ford Credit, Verizon, and Public Storage); (c) $8,200 by check to the defendant FREDERICK ANDERSON; and (d) $7,430 by check to the defendant NICHOLAS SPINELLI.

24.   In addition, my review of bank records for the primary Premier Links account revealed that approximately $937,750 of investor funds were transferred to an account controlled by an uncharged co-conspirator at Premier Links. Investor funds funneled from the primary Premier Links account to the co-conspirator's account were distributed to the defendants as follows: (a) $168,350 in checks to the defendant DARNELL JACKSON; (b) $87,753 in checks to the defendant CHRISTOPHER DAMON; (c) $66,498 in checks to the defendant FREDERICK ANDERSON; and (d) $940 in checks to the defendant MARGARGET AMATULLI.

D.   Alabama Regulatory Investigation

25.   On or about November 3, 2011, an investigator from the Alabama Securities Commission made a consensually recorded telephone call to the Premier Links office in response

to a complaint filed by a Premier Links investor.  The call was answered by the defendant DARNELL JACKSON,[3] who identified himself on the telephone as "Chris Damon."  JACKSON stated "we are not brokers, we are consultants."  JACKSON explained Premier Links' business operation to the investigator, stating "companies come directly to us if they are going to do an IPO or secondary offering and we have a research and development team that goes out and asks them why we should recommend your stock to our clients."  JACKSON explained that if the Premier Links "research and development team" gave the "thumbs up" on the company then Premier Links would recommend the stock to their clients.  JACKSON claimed Premier Links was "selling securities privately through the companies itself."  JACKSON told the investigator that he was aware of the Premier Links client who had complained to the Alabama Securities Commission about not receiving stock certificates and that "Margaret" from Premier Links would be calling the investor to figure out what happened to the investor's stock certificates.  The investigator asked JACKSON how Premier Links had come across the investor and JACKSON stated the investor was on a "lead base."  The

---

[3]    I have reviewed a recording of this call and recognize the voice of the defendant DARNELL JACKSON as the man who answered the call, having compared it to a known voice and video exemplar of DARNELL JACKSON.

investigator asked JACKSON if Premier Links had cold called the investor to which JACKSON replied "yes" and affirmed Premier Links had no prior relationship with the investor.  JACKSON affirmed Premier Links had cold called investors about a public offering outside of Premier Links' state.  JACKSON told the investigator Premier Links had cold called the investor "a year ago and introduced ourselves and said we were assisting in an IPO and he invested."

III.  The Subsequent Related Scheme

26.  On or about February 25, 2014, a cooperating witness ("CW-1")[4] met with the defendants MARGARET AMATULLI and DARNELL JACKSON in person in Princeton, New Jersey to discuss forming a corporation to act as an unregistered broker-dealer, in the model of Premier Links, to fraudulently sell shares of securities in a new "shell company" to unwitting investors. CW-1 was an investment promoter who had previously engaged in the fraudulent sale of securities in companies under his management with the assistance of the defendants and Premier Links. During the meeting, which was recorded on audio and monitored by agents in real time, AMATULLI and JACKSON stated, in sum and substance, among other things: that CW-1 should form

---

[4]  CW-1 has pleaded guilty to one count of securities fraud in this District, pursuant to a cooperation agreement, in the hopes of receiving leniency at sentencing.

a corporation, separate from his new shell company, and that the company would be used to receive investor funds for the purchase of shares of the new shell company. JACKSON stated that he could raise $2,000,000, by himself, from investors pitching shares of the new shell company.

27. On or about March 25, 2014, CW-1 met with the defendant MARGARET AMATULLI in person in Princeton, New Jersey to sell the Premier Links investor list to CW-1 for $500. During the meeting, which was consensually recorded on audio and videotape and monitored in real time by agents, AMATULLI stated, in sum and substance, that the investor list (which AMATULLI referred to as the "sucker's list") was used at Premier Links and included the purchase transaction history made by the investors from Premier Links sales representatives. AMATULLI described the list's value, in sum and substance, to CW-1 as follows:

> AMATULLI: "Yep.  Some of these guys I forgot.  Like
> there is this one guy.  His first trade was like
> $50,000.  You know it is just ridiculous amounts.
> Listen they were able to generate $6,000,000 from
> these guys.  Just from this list.  So you know, some
> of them might not be around but they are players."

> CW-1: "Yeah.  Do you think that we can generate
> another $6,000,000 from this list?"

> AMATULLI: "Listen, I am sure from just this list we
> can generate at least $3,000,000.  For sure.  But you
> have to handle them like a baby.  Do not lose that

list.  Do not put it out of order.  Keep it exactly
the way it is."
                *       *       *       *

AMATULLI: "Right.  And who is better than that?  This
is a list that; it's a win-win situation."

CW-1: "Do you know how to segregate who Chris Damon
brought in?"

AMATULLI: "It won't even matter."

CW-1: "Chris Damon, Darnell and who is the other
person?"

AMATULLI: "Nick Spinelli.  Nick Spinelli is going to
be on board.  A kid named Freddie Anderson."

CW-1: "So Nick Spinelli use to talk to people."

AMATULLI: "Like I said he (SPINELLI) left, you know,
into treatment.  But Nick is very good on the phone."
                *       *       *       *

28.  On or about April 11, 2014, CW-1 met with the

defendants MARGARET AMATULLI, DARNELL JACKSON and FREDERICK

ANDERSON in person in Princeton, New Jersey to discuss

continuing the ongoing scheme and to discuss the defendant's

prior involvement in the Premier Links scheme.  During the

meeting, which was consensually recorded on audio and videotape

and monitored in real time by agents, the defendant ANDERSON

stated, in substance:

        CW-1:   "And you are Freddie?"

        ANDERSON: "Yes I am."

        CW-1: "Nice to meet you."

ANDERSON: "We met before."

CW-1: "So I haven't met you at Premier?"

ANDERSON: "Yes you have.  I use to always be at the round table with Darnell (JACKSON) and King (DAMON). I was the other guy that they had at the round table."

CW-1: "And King is Chris Damon?"

ANDERSON: "Right.  Yeah it was me, King and Darnell. We met plenty of times.  You probably just don't remember my face.
                    *   *   *   *

CW-1: "I think you all know the main reason that we are here together, you guys aren't registered brokers."

AMATULLI: "No we aren't registered."

JACKSON: "No."

ANDERSON: "No."
                    *   *   *   *

CW-1: "Before I forget, about the pitch, it's going to include the company is going public?"

AMATULLI: "Oh, absolutely.  Everything."

CW-1: "That is like a key element."

AMATULLI: "The pitch will have everything and anything to do with your company.  As much information as you can give us that's as much as they will be prepared to say."

CW-1: "Regardless of a brokerage firm having endorsed it?"

AMATULLI: "We are not a brokerage firm.  So that won't be said in the pitch.  We are not a brokerage firm. We are consultants."

JACKSON: "We are the consultant firm that is raising money to bring the deal public.  That's what we do.  And that is how we would phrase it if anything.  We are not brokers."

CW-1: "That's right.  And the script is going to say in there it is definitely going to go public with an IPO?"

ANDERSON: "Right."
                    *   *   *   *

CW-1: "I got a solid feeling from you (JACKSON).  How much do you think you (ANDERSON) will be able to pull in?"

ANDERSON: "Me? Honestly with my work ethic I don't set a limit for myself.  So basically anything is possible to be honest with you."

CW-1: "So well into the millions?"

ANDERSON: "Yeah."

CW-1: "Two million?"

JACKSON: "I can do two million by myself."

ANDERSON: "Myself."

JACKSON: "I can raise five million by myself.  I am putting my head down.  I am tearing this apart."

AMATULLI: "You have veterans here.  You have him (JACKSON).  King (DAMON) is a phenomenal account opener.  You would not think.  Not to say this in a bad way but when he gets on the phone you would not know he is black on the other end.  When he is focused and settled."

CW-1: "Yeah.  King is Chris Damon."

JACKSON: "He is a beast.  And guess what [CW-1]?  I trained him."

CW-1: "Really?"

JACKSON: "Yeah.  He is my protégé (laughs)."

CW-1: "You trained him?"

JACKSON: "I trained brokers as well as King.  I brought him into the business and taught him how to do it.  I taught them all."

AMATULLI: "And you have Nicky (SPINELLI) that is also good on the phones.  So you have three.  Freddie is good on the phones but he doesn't have the same experience that they have.  But he will hold his own."

ANDERSON: "Right."
               *   *   *   *
CW-1:  "Tell me something, what name did you (ANDERSON) give them (Premier Links investors)? Because I don't know anybody that said Fred?"

AMATULLI: "He pitched under Chris Damon."

ANDERSON: "Right."

CW-1: "Oh."

AMATULLI: "Everybody that's how it was.  He was a cold caller for Chris Damon.  That's how he did it."

ANDERSON: "That's how it was structured.  Right. Something similar to what we are talking about right now."


29.  On or about April 15, 2014, CW-1 met with the

defendants MARGARET AMATULLI, CHRISTOPHER DAMON and NICHOLAS

SPINELLI in person in Princeton, New Jersey to discuss

continuing the ongoing scheme and to discuss the defendants'

involvement in the Premier Links scheme.  During the meeting,

which was consensually recorded on audio and videotape and

monitored in real time by agents, the defendants stated, in sum and substance,

> CW-1: "You guys got like what 25% when you raised money?"
>
> DAMON: "Yes."
>
> SPINELLI: "Yes."
>
> CW-1: "How much did you raise? Sounds like you (SPINELLI) might have done the best.  Who did the best?
>
> AMATULLI: "They all had high numbers.  They all had high numbers."
>
> SPINELLI: "In my two years I was in the range of about $2,000,000.  After that I don't know where it went from there."
>
> DAMON: "I did about $4,000,000 I guess."
>
> AMATULLI: "You have the three main guys."
>
> DAMON: "Me, Darnell and Nicky."
>
> AMATULLI: "Yes. Freddie is just a guy you know."
>
> DAMON: "Freddie is gonna be like a caller, you know."
>
> AMATULLI: "Whatever he (ANDERSON) does he does."
>                       *   *   *   *
>
> AMATULLI: "This is a lay-up when it comes to IPOs for a client."
>
> CW-1: "Very good."
>
> SPINELLI: "Yeah I am telling you that is the biggest selling point.  Just saying IPO and then plus saying warrants with it.  Forget it."
>
> DAMON: "Yeah $0.30 a share, two warrants, you know."

SPINELLI: "Forget it.  That is a selling point within itself.  I mean honestly I can probably pitch the company just like that and get people to buy it. Without the information.  I could just send the information after."

AMATULLI: "Because whoever is an investor; believe me IPOs don't come often.  You know they are very rare now.

SPINELLI: "You need to jump on them."

DAMON: "And then you get warrants with them is even better you know."

AMATULLI: "And whoever is an investor just as soon as you say IPO they are like, ok how much?"

SPINELLI: "Yeah, you grab their attention right away. This is a good thing.  This is a good thing for everybody."

DAMON: "We give them a spiel about what the company does.  Then we sell ourselves.  You know, our expertise, knowing what we are doing.  And then direct them to you."

AMATULLI: "I will teach you."

DAMON: "Margaret will show you the right way.  This is why I am at where I am in this business.  Margaret is the brains of the operation."

CW-1: "That is good."

AMATULLI: "Don't tell the feds that."


## CONCLUSION

Based on all of the foregoing information, I conclude

that there is probable cause to believe that the defendants

MARGARET AMATULLI, FREDERICK ANDERSON, CHRISTOPHER DAMON, DARNELL JACKSON, NICHOLAS SPINELLI and others did knowingly and intentionally conspire to execute a scheme and artifice to commit mail fraud and wire fraud contrary to Title 18, United States Code, Sections 1341 (mail fraud) and 1343 (wire fraud), respectively, all contrary to Title 18, United States Code, Section 1349.

WHEREFORE, I respectfully request that the defendants MARGARET AMATULLI, FREDERICK ANDERSON, CHRISTOPHER DAMON, also known as "King," DARNELL JACKSON, NICHOLAS SPINELLI be dealt with according to law.  Furthermore, I respectfully request that this affidavit be filed under seal.

RYAN ADAMS
Special Agent
Federal Bureau of Investigation

Sworn to before me this
17th day of December, 2014.

_____
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK